SUAREZ-SIMICH v. ASHCROFT Good morning, Your Honor. My name is Howard Davis. I am representing the Supreme Court representing the Petitioner, Julio Cesar Suarez-Simich. I'd like about two minutes or so for rebuttal. When you take a look at the Board's decision and Respondent's brief, you would have thought that Mr. Suarez was having a problem with his, wasn't liking the way his career was going, and decided to take advantage of a vacation leave to skip the country and make a lateral career move. And it kind of reminds me a little bit of the Board's treatment in a case called Tagaga v. Ashcroft 228-1030, which, although it's not cited in my briefs, it is cited in one of the cases that I did refer to, in which someone left, decided to make, he was a Fiji Indian and left, and he was serving in Lebanon and had refused to do certain acts against Fiji Indians and had problems, and then he left, went AWOL, etc. And I would say that in this particular case, with regard to the Board here, when they say that, in the original decision on the underlying case, it says that the desertion from the military plausibly explains why the military is still interested in him. And even if the court, just setting aside the whole issue of whether or not he had past persecution, because even if he didn't, I mean, this Court's decision in Lim v. INS, you can take a look at, even if you don't find past persecution, you're taking a look at really the whole, the thing as a whole. And the standard here is not that there was a, that the military, that there was a, that military desertion was a plausible reason, but as this Court mentions in Deloso, the question is whether the record compels a conclusion that the motive of the government is at least in part on account of an imputed political opinion. And in this case, the record clearly compels that. Before he left, I mean, even before the whole issue of military desertion even came up, which is something that happens after he left, but before, he's, he came, he discovered that aerial photographs were being used in an illegal manner, and he brought that to the attention of superiors, general, majors, colonels, all these people that he went to, and their response was, is, you know, basically, to put it colloquially, get with the program, and warned him of dangers to his career and his life if he persists, and he does persist. And in fact, two days before he leaves, one of the, a general is, is mentioning the whole thing about what he knows and, and who's he going to use it against. And this is very much on their mind. And even after he leaves, and this is not even Mr. Davis. You know, it looked to me like the immigration judge did a pretty careful job of examining the circumstances under which he left, and the one thing that the judge mentioned that cuts against the argument you're making here is that he was allowed to leave the country on a 30-day vacation by superior officers in the Air Force who had the authority to deny him leave if they were truly concerned about his whistleblowing activity. Well, first of all, Your Honor, the, the general with whom he was having problems was not the individual who granted his leave for, for vacation leave. This particular general did, there was a letter which is, if I recall, I think it's undated, in which he said, just certifying that Mr. Suarez is, is employed by the Air Force and that he may use this to take to the Spanish embassy for a visa. But the actual grant of the vacation leave came from someone else with whom there wasn't any mention that he had problems with. How do you address the, how do you respond then to the immigration citation to the fact that when he went to the United States embassy in Peru to obtain a visa, he never said anything about the, these whistleblowing activities? Well, I think the, the thing is, is, and, and just, I'm also going to just speak anecdotally here. Well, let's try, let's try and speak from the record. That helps me more. I'll speak to the record. And, and he, and he said, and I believe very plausibly that he was afraid that if he did say that, then they wouldn't give him the visa. Because when you take a look at it, what's he asking for? He's asking for a tourist visa. The whole basis of a tourist visa is, is that you have to show that you're going to return to your country after the limited amount of time. He says, I'm afraid because of my whistleblowing activities. And he specifically did say to the judge that, that when he made a decision that he's going on vacation, he knew that he would have to flee Peru due to the, and then the judge cuts him off. But if he had come like that to the embassy, they would have, they would have imputed to him immigrant intent, which would be against a whole tourist visa scenario. So he was afraid that, you know, that he wasn't going to be able to get anything from them. I would like to go back to, we made this comment about the, he was having problems because of his whistleblowing activity. How do we, what is the evidentiary basis for making the transition from having problems, quote, unquote, to persecution, past persecution? Well, I think that as far as past persecution. I mean, you know, I could say my sergeant doesn't like me. He put me on KP three times in a row. Is that persecution or is that? No, I mean, that's, this wasn't, and that's not persecution. And what he did say, and maybe is that there was pressure on him, making it clear that would be difficult to his life and career. And when he was asked about, well, what does that mean to you? He said that he was afraid that he could be assigned to a place and then made to disappear. It's, and in fact, he did try to, in order to get out of having to, for the pressure, he does talk about the pressure and the threats to his life and career, and which he took to mean that, like I said, he could be taken out to a jungle area and he made to disappear. And he mentioned another case that he had heard of it. Now, even again, even if just, and so there was a series of those. I mean, it was the pressure that he felt would cause him to leave. I mean, this is a person who wanted to, you know, to make it in the military. He said, you know, and that he had hoped one day to be a general. And as his sister mentioned that people in the military generally pretty well taken care of. So speaking of his sister, she had something to do with some of those photographs, too. She wasn't subjected to any persecution, was she? No, but she was not in the same position. I mean, even let's say like his parents, for example, who have received the anonymous phone calls. I mean, they've been receiving the phone calls, although they haven't gone specifically after the parents. And it's Mr. Suarez. Well, I know we're running out of time, but I wanted to ask you about the anonymous phone call system, what they prove. Because isn't it equally possible if you live in a country where people are unsafe for various reasons, that an anonymous phone call might be from a friend as well as someone wants to do you harm? I mean, it's a neutral fact, isn't it? Because it sounds like a warning. Maybe you shouldn't hang around here. Right. What does that mean? Well, I would like to point to there is a point in the record where the father does make a complaint to the police and he mentioned specifically what the contents of a couple of those anonymous messages were. And they did refer, a couple of them did refer specifically saying, referring to Mr. Suarez's knowledge of the irregularities in the unit and that he should not come back to, you know, divulge. So, I mean, some of those anonymous phone calls did speak specifically about what the problem was with. Connected to the whistleblowing. Yes. And then there were other anonymous phone calls. And the thing is, if I refer the Court to Nijiguna v. Ashcroft at 374 Fetzer 765, the thing is, is that this whole thing is in the context of Mr. Suarez's activities in the context of the Air Force and that there is no evidence, as in Nijiguna, that the, that the, that anything came from everybody else. And Nijiguna refers to a case, Cardenas, holding that record compelled conclusion that telephone threats came from persecutors in absence of evidence to the contrary. I mean, these are the only people who are interested. And they also talk about the Air Force, the automobiles, the Air Force that are connected to the Air Force that are at his home. This has been ongoing and relentless. So, I see my time is up. Okay. I'll give you a minute for rebuttal. May it please the Court. Margo Nadell from the United States. We're here today for two petitions for review, and both of them should be denied. With respect to the first petition review relating to the merits of the asylum claim, substantial evidence supports the Board's conclusion that Petitioner's life would not be threatened on account of a protected ground in Peru. He didn't suffer any past harm of any kind. He received some vague threats. But based on this, there is simply not a case for past persecution against the respondent based on this Court's precedent and based on the facts in this case. Well, it's interesting because the Board assumes credibility in making its determination. They do assume that he is credible. And so they basically say, even if what he's telling us is true, they focus on the future persecution, that he hasn't proved or established a threat of harm because desertion gives a plausible explanation for why they might be coming after him. But under Deloso, why isn't there enough evidence to suggest that there's also a plausible, given the credibility assumption, case that may be part of his desertion, but it's also part of this whistleblowing activity with the Air Force? Well, I think Deloso is distinguishable in part because of the harm that the Petitioner suffered when he was in his home country in Deloso. In Deloso, the Petitioner was shot at. He was attacked with knives. I mean, there's simply nothing in the record that we have that rises to that level here. Not the anonymous calls and the threats? There are anonymous calls, but as the Court stated in Lim v. INS, mere threats standing alone generally do not give rise to a case of past persecution. I think we're talking about fear of future persecution. Right, and so the only issue remaining would really be whether there would be a fear of future persecution. And given that the Petitioner's family remains in Peru, all of them are aware of these aerial photographs and aware of the situation, no harm has apparently come to any of them. There's no evidence in the record to suggest that there has. He stopped his brother at the airport thinking it was he. Which would be entirely consistent with somebody who had deserted the military after taking a four-week vacation and failing to return. And so the Board was supported by substantial evidence in concluding that even based on the brother's apprehension, that that was not sufficient to trigger a finding of likelihood of future persecution or possibility of future persecution. And with respect to the motion to reopen Petition for Review, there was no abuse of discretion because the additional information that was introduced, the additional evidence that was introduced relating to these anonymous phone calls had already been introduced previously. Even though there were additional anonymous phone calls, the evidence was essentially the same. And as previously stated with respect to the brother's apprehension at the airport, that would be entirely consistent with a finding that the Petitioner had departed and had failed to comply with his military obligations. You know, I'm still troubled, though. If because of the Board's finding of credibility, that means that I think we have to credit that he was involved in this dispute with the Air Force, which could, and the Board itself seems to assume, would be a whistleblowing type of activity that would be a protected, imputed political ground. So therefore, I'm still troubled by the notion that they're saying all of this activity that's going on regarding him is solely attributable to his having gone AWOL. Because if one is a whistleblower against the Air Force, it lends some plausibility to the notion that someone might be at risk if, in fact, he was a whistleblower against high government officials in the Air Force. So why isn't that enough to say that he's created a reasonable fear of future prosecution, of future persecution? Right. I think that the two things are at issue. First, I think that the other cases in which this Court has found whistleblowing to be a protected activity, the Petitioner has actually blown the whistle. I mean, the Petitioner has, in effect, gone to the authorities and testified against the Air Force. Well, he's done that here. He's gone up the chain of command. He's gone to the people who are involved in the corruption themselves and suggested that he did not want to be part of it or that they shouldn't be doing it. I don't think it's analogous to this Court's precedent in other whistleblowing cases. Aren't they the ones likely to carry out the retribution? Yeah. Yes, they are. I think that – So he's gone public with it. But he hasn't gone public. He's merely – But he's gone public to the people he's accusing, and they're the ones that would be the source of the persecution, wouldn't they? Yes, Your Honor. But he hasn't in any way exposed them. I mean, there's no question. Do we know that? Yeah. The record – I mean, that's what the record – the conclusion that the record would support. But in any case, the issue is whether or not the record compels an alternate conclusion to the one that the Board reached. And the Board reached the conclusion that based on all of the evidence in the record, the reason why the Air Force was after the Petitioner was because he had deserted. And given that he had taken this four-week vacation, that he had been granted permission to – Well, I don't think there's any doubt that it compels the conclusion that desertion is a ground. The question is whether it compels the conclusion that it's the only ground. I think, Your Honor, that the record evidence doesn't compel the conclusion that he was persecuted on account of his whistleblowing activities. We're talking past each other. I'm looking at what the Board says. They say the record – he's a whistleblower. We'll accept that. But there's no evidence that he was persecuted in the past or that he has any reasonable basis of being persecuted in the future. And that's what I'm trying to sort out here. Because if one assumes he's a whistleblower in Peru  why isn't one part of what the record shows is that whatever they may get him for going AWOL, being a deserter, there's still a reasonable likelihood that he can also, going back there, caught up in the system for that, be subjected to persecution for being a whistleblower. By the people against him, he blew the whistle. And I think that the reason why the Board is supported by substantial evidence in concluding that he wouldn't be likely to be subject to a future persecution is based on evidence in the record that suggests that his vacation was approved, evidence that his family members, who are also aware of this alleged corruption, continue to remain in Peru unharmed, and that the record evidence simply doesn't demonstrate that there is a likelihood of future persecution. What is your understanding of our standard of review on the choice that was made in not linking his difficulties with the protected activity, but only linking them with the desertion? The standard of review? The standard of review for asylum decisions is abusive, pardon, is substantial evidence. Substantial evidence in the record. Right. Right. And then the motion to reopen, which is a separate case, the two cases were consolidated, the Court's standard of review on that would be the abusive discretion standard. I see I am running out of time, Your Honors. In conclusion, both petitions for review should be denied. The first petition for review relating to the substance of the asylum claim should be denied because the Board was supported by substantial evidence in concluding that there was no past with persecution and nor would there be future persecution. And with respect to the second petition for review relating to the motion to reopen, there was simply no abusive discretion in denying that motion to reopen, if the Court has something further. All right. Thank you. Do you have a minute? Thank you. First of all, with regard to the issue of exposure and blowing the whistle, neither Grave nor Hassan define all the scenarios for blowing the whistle. And it is a definitely did it in the context of a government public act and he went to the people who were intertwined with the government. That itself is public. The other thing is that as in his declaration, in a declaration by Professor Thomas Davies, he mentioned that corruption, and this I'm pointing to 165 of the second, of the consolidated administrative record, corruption has always plagued the Peruvian military and police and with greater escalation in the 90s. And this is when this took place. And so this is rampant. This is just part of what's going on there. With regard to the vacation, again, I refer the Court to page 168, in which Professor Davies talks about the whole bureaucracy in getting the vacation and how one person just can't automatically stop it. And there's a whole bureaucratic process that he talks about. And then. Okay, last point. Okay, last point. Again, the fact that his family's there, they're being hounded with the anonymous phone calls. And with regard to connecting Judge Goodwin's question about the standard of review and connecting, let's say, the events to applying the law to the facts with regard to a motive, I would say that actually it should be de novo. It's a mixed question of law and fact. And this has to do with how you characterize the conduct in terms of putting it in one of the asylum categories. And with that, unless the panel has any other questions, thank you. Thank you. Counsel, we appreciate the argument. And the case argued is submitted.
judges: Goodwin, Fisher, Tallman